| | |
|---|---|
| 26 | 111 |
| 140 | 80 |

</div>

# Carson *versus* Godley.

An owner of a storehouse, which was erected under his own superintendence, and leased to the United States government, is liable to a party whose goods were destroyed by the fall of the building in consequence of its insufficiency for the purposes for which it was erected and leased.

That there was no warranty of the capacity or strength of the building, or designation of the purpose for which it should be used, in the lease, does not alter the principle.

The application of the maxim *sic utere tuo ut alienum non lœdas,* is not restricted to common nuisances.

That other stores erected by the defendant in the same vicinity had previously fallen, was competent evidence, as notice to the defendant, of the required character and strength of a building for the purpose to which it was to be applied.

Such evidence was however not competent to establish the general character of the defendant or his workmen as builders.

Godley *v.* Hagerty, 8 *Harris* 387, affirmed—BLACK, J., dissenting.

CERTIFICATE from the Court of Nisi Prius.

This was an action on the case by George C. Carson and Charles Newbold, trading as Carson & Newbold, to recover damages occasioned to their property by the falling of a building owned by the defendant. The building in question was erected by Godley in the summer of 1850, near the corner of Dock and Second streets, Philadelphia. The building was five stories high, the lower story front being of granite and the remainder of brick. Godley, who was a merchant, superintended the erection of the building himself, without having employed any master-builder or architect for that

[Carson *v.* Godley.]

purpose.   While the building was in progress, Godley had several conversations with the superintendent of public stores of the United States, who informed the defendant that if the government leased the stores they wanted them of the strongest kind, and for the storage of heavy merchandise.   After the building was completed it was examined by the officers in charge of the custom store-houses, and upon their examination and knowledge of the building, leased for the use of the United States government by the collector of the port, and possession taken on the 25th July, 1850.   The lease contained no stipulation as to the manner in which the building was to be used, or covenant as to its fitness or adaptation to the purpose of storing goods.   The lower story of the building was used for storing iron, hardware, &c., and on the second floor the officers commenced storing sugar which was under bond.

In the afternoon of the 9th August, 1850, Godley visited the store in company with the officer in charge of that department of the customs, and upon examination they found a small crack in one of the arches.   Mr. Godley proposed to have it walled up or otherwise secured, but the officer did not wish to have it done at that time.   On the following morning, while the workmen were still engaged in putting in the sugar in the store, it fell, destroying a large quantity of sugar belonging to the plaintiffs, the value of which they seek to recover in this action.

The evidence as to the character of the materials and the strength of the building and its adaptation to the purpose of a government warehouse was conflicting.   The officers testified that they did not lease it upon the representations of Godley, but upon their own knowledge and examinations; nor in storing did they rely upon his opinion of its capacity, but upon their own opinion of its strength to sustain the weight they had ordered to be placed in it.

On the trial the plaintiff offered to prove that Godley had built other stores in the same row previously, which had fallen shortly before he commenced building the store in question.   The defendant objected, but the court overruled the objection and admitted the testimony.

The counsel for the defendant presented the following points, and prayed the instruction of the court thereon :—

1. That if the jury believe the plaintiffs' goods were stored in the warehouse belonging to the defendant, at the time the same was leased to and in the occupancy of the United States, by the order and direction of the United States, and without any authority from the defendant, the plaintiff cannot recover.

2. That if the jury believe that any representations made by defendant, relative to the character of the building, were never communicated to plaintiffs, and that plaintiffs were not induced by

[Carson *v.* Godley.]

fraudulent representations of defendant to store his goods on the premises in question, plaintiffs cannot recover.

3. That where a tenant rents a building generally, without specifying any particular purpose, he has no right to use it for any purpose for which its open visible construction unfits it, and if he does so, the owner is not responsible.

4. That if the building in question was erected under the supervision of an officer of the United States Custom House, in accordance with his suggestions, and with a full knowledge on his part of its imperfections, if any, and was so taken and received by the United States, plaintiffs, being parties whose goods were stored in the building by order of the government, cannot recover in this suit.

5. That after the possession of the premises was given to the United States, the control over them, so far as the defendant was concerned, ceased, and that defendant could not compel the government officers to permit him to brick up the arches, or shore up the wall containing them against the consent of the officer in charge, Colonel Harris; and that the officer could have resisted any attempt on his part to do so, and, if he deemed proper, expelled him from the building.

6. That the defendant was only bound to employ reasonable skill and care in the erection of the store; and if the jury are satisfied he did so, and that the persons employed as mechanics were good workmen in their particular branches, the materials good, and reasonable skill employed in its design and construction, the defendant is not liable.

7. That if the government officer in charge of the building, Colonel Harris, was warned by defendant of the mode in which the building was being loaded, and an offer was made to brick up the wall containing the arches, and to do everything requisite to insure the safety of the building, which was declined, the defendant did all he had power or the law requires him to do, and the plaintiffs cannot recover.

8. That if the jury believe the orders given by Colonel Harris to desist storing were disobeyed by the gang of men employed, and that the building fell in consequence, the plaintiffs cannot recover.

9. The arches in this building being perfectly visible to the eye of the occupants, and the peculiarity of their construction known to them, they were bound to use them with such caution as their structure required; and if they imprudently overloaded them, the owner is not responsible.

10. That if Colonel Harris would not permit Mr. Godley to brick up these arches, Mr. Godley is not responsible for the injury which has occurred, in consequence of their giving way.

11. That having no right to interfere with the building, Mr.

[*Carson v. Godley.*]

Godley was only required to offer to strengthen it, and if that offer was rejected, he is not liable in this suit.

12. That if the jury believe that the attention of Colonel Harris was directed to the storing of the sugars, and the offer was made to him by Mr. Godley to do anything that should be necessary to secure the building, which offer was repelled, Mr. Godley, as landlord, had no right to brick up the arches contrary to his wishes.

His Honour, Judge KNOX, charged the jury as follows :—

"Did the defendant cause the building in question to be constructed in a proper manner, and with good materials, and by competent workmen? Or was there negligence in the erection of the building, either as to the design or in the execution of it?

"In determining the question of negligence, the jury should consider the purposes to which the building was to be put, and they should also consider the evidence as to the directions given, and the desire expressed by the government officer to have the building erected in a particular manner.

"If there was negligence on the part of the defendant, then the jury are to inquire whether this negligence was the cause of the injury; if it was, the plaintiffs are entitled to recover to the extent of the injury sustained. If, however, there was no negligence on the part of the defendant; if the building was properly constructed, of good materials, and by competent workmen; or, if the injury was sustained by reason of the want of due care on behalf of the government or its employees, as to the manner of using the building, the plaintiffs cannot recover."

"The points were answered as follows :—

"1st. In the negative.

"2d. In the negative.

"3d. This proposition is correct; but if the evidence is believed, this building was leased for heavy storage, and might legally be used as such.

"4th. We have already said that the facts mentioned in this point may and should be considered by the jury, in determining whether there was default on the part of the defendant; but we cannot say, as matter of law, that the knowledge of Colonel Harris of an imperfection in the erection of the building, even if suggested by him, would excuse the defendant in an action brought by a stranger.

"If the defendant knew that the building was to be used for heavy storage, he was bound to use reasonable care and skill in preparing it for such a purpose; up to the time it was leased to the government, it was under his exclusive control and direction.

"5th. Answered in the affirmative.

"6th. Answered in the affirmative.

"7th. If the jury believe that the building was loaded beyond

[Carson v. Godley.]

what would have been reasonable for a building properly constructed for heavy storage, and that by this the injury was sustained, the plaintiffs cannot recover; or, if the jury believe that the injury was sustained for the reason that the employees of the government were negligent in the manner of storing away the sugars, the plaintiffs cannot recover; but we cannot say that the offer to brick up the arches 'was all that the defendant had power to do, or all that the law required him to do.'

" 8th. There is no evidence that we recollect that the men were instructed by Colonel Harris to cease storing, but merely to take the whole building to place the sugars in. We have already said that if the injury was caused by the negligence or misconduct of the men, the plaintiffs cannot recover.

" 9th. Answered in the affirmative.

" 10th and 11th. If the jury are satisfied that the injury might have been prevented by bricking up the arches, and that the defendant offered to do it, and was prevented by the government officer having charge of the building, the plaintiffs cannot recover.

" 12th. This has been already substantially affirmed. The defendant is only liable for his own negligence, and not for that of those over whom he had no control."

The jury found a verdict for the plaintiffs for $3123.38. A motion made by defendant for a new trial was overruled; and the defendant took a certificate to the court in banc, and assigned for error the charge of the court, the answers to the points, and the admission of the evidence above stated.

*H. J. Williams* and *C. E. Lex*, for plaintiff in error.

*J. Fallon* and *Serrill*, contrà.

The opinion of the court was delivered by

WOODWARD, J.—In the case of Godley v. Hagerty, 8 *Harris* 387, we held the present defendant responsible for an injury occurring at the same time and resulting from the same causes as that of which the plaintiffs in this action complain. It was shown in that case as in this that Mr. Godley had rented his building in Granite street to the government of the United States for a public warehouse, and that the agents of the government were engaged in storing sugar when it fell down, killing two men, breaking the arm of Hagerty, and damaging the goods of the present plaintiffs. In two particulars only, this case differs from Hagerty's. The plaintiffs here were importing merchants, and the injury was to their goods. Hagerty was a common labourer in the service of the government, and his injury was personal. But these diversities make no difference in the principles of law applicable to the two cases. If, as was urged in the argument, the government was

[Carson *v.* Godley.]

bound to provide safe storage for the plaintiffs' goods whilst they were held in bond, it was equally due to Hagerty that he should not be set to work in an unsafe storehouse, to the peril of life and limb. If, therefore, the present plaintiffs, by reason of their relations to the government, were entitled to seek redress in that quarter, so was Hagerty. As the employee of the government, his relations were quite as direct and intimate with the public authorities—his privity quite as close—as any which the plaintiffs sustained, whilst the character of his injury gave him a superior right to compensation. Nor did we decide that the government was not liable to Hagerty. We decided only that Godley was. Counsel do not therefore distinguish this case from Hagerty's when they prove that these plaintiffs might have sought redress from the government. Let it be granted that they might, does it follow that Godley is not liable to them? By no means. An injured party is often entitled to redress against more than one wrongdoer, and it is never an objection to his action that he has passed by the intermediate agents of the mischief, and charged the responsibility home upon the author of the evil.

This case, then, incapable of being distinguished in principle from Hagerty's, ought to be considered as ruled by it. All the material facts were identical in the two cases. Judge BELL, not more distinguished for his learning than for the care and ability with which he tried causes at Nisi Prius, stated the principles on which the former case rested; and his judgment, after a severe professional criticism, and full consideration in this court, received our deliberate and unanimous sanction. And in the three years that have elapsed since that decision was pronounced, we have seen no occasion to question its principles, but experience and observation have tended rather to confirm them. Such is the eagerness of capitalists for large rewards, that when they undertake to build for the profits of rents, the temptation is strong to cheapen and slight the work. The safety of life and property is lost sight of in the dazzling prospect of a large rent from a small outlay. Foundations are put down and walls run up in such haste and with such materials as to be wholly inadequate for the purposes designed; the defects all the more pernicious and unpardonable, because concealed; and now and then the community are appalled by some shocking catastrophe involving loss of lives and limbs and property. The cupidity which is at the bottom of the mischief, true to nothing but its own instinct, will of course seek to charge the consequences of its folly on the tenant, as if because he was deceived, the original guilt was cancelled. Where the tenant has been guilty of negligent or improper use of the building, he is undoubtedly liable to parties injured by its fall, and even where there has been no negligence on his part, we do not say he is exempt, for that case has not yet occurred; but where,

[Carson v. Godley.]

as in the case before us, it is found, on abundant proof, there was no negligence either in the tenants or the plaintiff, it is a salutary rule of law that holds the owner answerable for his gross neglect in constructing and renting an insecure building. We have no thoughts of relaxing or qualifying a rule so obviously just and politic; but if we had, we would hardly do it in a case involving the very same circumstances to which we so recently applied it.

It may be proper, however, on account of the vehemence with which the rule is assailed, to examine its foundations a little more minutely than was done in the former case, to see if it be not well grounded in accepted principles and authorities of law.

The lease, in this case, contained no express covenant or condition, that the building was of any particular capacity or quality, and none is to be implied. The government took it for what it is called in the lease, a "five story store," and the only covenant which is to be implied, is that for quiet enjoyment. There was a while that the English courts acted on the principle that it was an implied condition of every lease, that the property was reasonably fit for the purpose for which it was let. As that a dwelling-house was in such decent repair as to be fit for habitation, Salisbury v. Marshall, 4 Car. & Payne 65, 19 E. C. L. R. 275; that its walls were safe, Edwards v. Etherington, Ryan & Moody 268, 21 E. C. L. R. 435; that the premises should not become untenantable by the bursting of a privy, Cowl v. Goodwin, 9 Car. & Payne 378, 38 E. C. L. R. 162; that the house was not infested with bugs, Smith v. Marrable, 11 M. & W. 5: but they have receded from all this, and hold now, that in a demise of land, there is no implied obligation on the part of the lessor, that it shall be fit for the purpose for which it was taken, Sutton v. Temple, 12 M. & W. 52; nor in the lease of a house, that it was at the time of the demise, or should be at the commencement of the term, in a reasonably fit state and condition for habitation.

In the case of Arden v. Putten, 10 M. & W. 321, the house became uninhabitable and utterly useless to the tenant by reason of original defects in the foundations; and it was held that the tenant could not, in consequence thereof, throw up the house and refuse to pay rent. "The tenant ought," said Baron ALDERSON, "to examine the house before he takes it." If the present action rested on the ground of contract, express or implied, it could not be sustained. Counsel argued with great propriety that if an implied warranty of the quality of a house could be deduced from a lease of it for a term, it would arise, likewise, from a conveyance of the fee, and run with the land, which would restrain alienation. Some torts result from contracts; but that for which this action was brought, has no such foundation. Its root is in the malfeasance of the defendant—in the misuse of that which is his own—not in the breach of any condition, express or implied. It is

[Carson *v.* Godley.]

apparent, therefore, that the English cases adverted to, all of which proceed on contract, do not touch the ground assumed in Hagerty's case and the present.

The underlying principle of this case is found in that great maxim of the common law, *sic utere tuo ut alienum non lædas.* This is a principle of universal obligation, and it attended Mr. Godley when he undertook to cover his lot in Granite street with storehouses for the use of tenants. The application of this principle is illustrated by innumerable cases in the books. Setting aside all those that relate to mere personal rights and chattel interests, I select a few to show how it applies to an owner of real estate. And here again is a large class of cases such as grow out of obstructions of private ways, diversions of watercourses, and common nuisances, that may be omitted. But there is a class of cases in which the owner of real estate has been held liable in damages for that which it was perfectly lawful for him to do on his own premises, but which, done without that skill and prudence which he was bound to employ, has worked injury to another. Thus in Vaughn *v.* Menlove, 7 *Car. & Payne* 525, 32 *E. C. L. R.* 613, the plaintiff brought case to recover damages for the loss of two cottages burnt down by the spontaneous combustion of defendant's hay-rick defectively erected on his own land. PATTESON, J., directed the jury to inquire whether defendant had acted as a man of ordinary skill and prudence would have acted, or whether, through his negligence and carelessness, the plaintiff's property had been consumed. It was not enough, he said, that the defendant acted *bona fide* according to the best of his own individual judgment—a doctrine which the whole court said, in affirming the judgment, would utterly preclude any certain and intelligible rule on the subject.

In exact agreement with this case, Judge KNOX, on the trial of the case under consideration, first directed the attention of the jury to the question whether the defendant caused his building to be constructed in a proper manner, and with good materials, and by competent workmen. These things it was most clearly his duty to do as a man of ordinary prudence, and these things the jury have found he did not do. No matter how sincere the self-confidence that prompted him to superintend the work himself, and save the expense of a master builder, and to use imperfect and unfit materials, the *bona fides*, even *optima fides*, could not relieve him from the clear legal duty that was on him to act in a "proper manner, and with good materials and competent workmen."

But, to proceed with the authorities: Tubervil *v.* Stampe, 1 *Salkeld* 13, S. C. *Ld. Raymond* 264, was an action on the case for negligently keeping fire by the defendant in *clauso suo*, whereby a neighbour's corn was burnt. After verdict for the plaintiff, it was objected that, by the custom of the realm, liability for fires ex-

[Carson v. Godley.]

tended only to those in the house or curtilage which were under the power of the owner; but, said the court, the fire in his field is his fire as well as that in his house; he made it, and he must see it does no harm, and answer the damage if it does.  To the same effect is the case of Barnard v. Poor, 21 *Pick.* 378, which was a recovery also for damage from fire kindled on the defendant's own land.

In Russell v. Prior, 1 *Ser. & R.* 460, a tenant for years erected a wall which darkened the ancient windows of a neighbour, and then made an underlease to J. S.  The party injured brought suit for the nuisance and recovered damages, and then brought a suit for the continuance.  Both actions were against the first tenant, the lessor in the last lease, and the question was whether after recovery for the erection, an action would lie against him for the continuance after he had leased to another—*et per Cur.* "It lies; for he transferred it with the original wrong, and his demise affirming the continuance of it;—he hath also rent as a consideration for the continuance, and therefore, ought to answer the damage it occasions."

That a party for whose benefit work has been negligently done, is answerable for consequences, was strikingly illustrated in the case of Bush v. Steinman, 1 *Bos. & Pul.* 403.  The defendant had purchased a dilapidated house by the way-side, which he had never occupied.  He contracted with the surveyor of buildings to repair it.  The surveyor contracted with a carpenter to do the whole labour, and to furnish all materials.  The carpenter employed a bricklayer under him, and he again contracted for a quantity of lime with a lime burner, by whose servant the lime was deposited in the road in front of the defendant's house.  The plaintiff and his wife passing in a chaise, were upset and injured by reason of the lime in the highway.  On great consideration the defendant was held liable, not on the ground that the relation of master and servant existed between him and all of the employees, but because he was the owner of the premises for whose benefit the nuisance was created, and having suffered it to remain in front of his building, and between it and the middle of the highway to which his premises presumptively extended, he was answerable for it.

So, in Randelson v. Murray, 8 *Adol. & Ellis* 109, 35 *E. C. L. R.* 342, a warehouseman at Liverpool, employed a master porter to remove barrels from his warehouse.  The master porter employed his own men and tackle, and through the negligence of the men the tackle failed, and a barrel fell, and injured the plaintiff—held that the warehouseman was liable in case for the injury.

In Stone v. Cartwright, 6 *Term R.* 411, Lord KENYON, in ruling that a mere steward of an owner of real estate is not responsible for the acts of the men employed by him for the owner, said,

[Carson *v.* Godley.]

" in all these cases I have ever understood that the action must either be brought against the hand committing the injury, or against the owner for whom the act was done."

In the case of the Mayor, &c., of the City of New York *v.* Bailey, 2 *Denio* 433, we have the principle distinctly asserted and indicated very much at large, that the owner of real estate is responsible for the negligence of those appointed by public authority to make erections on it, for the owner's benefit. The city of New York owned the Croton dam, which had been erected to supply the city with water. An unusually high flood in the river swept the dam away to the injury of the plaintiff, a riparian owner below. He sued the city, and showed that the dam had been defectively constructed. The answer was that the dam had been erected under the supervision of and by the Water Commissioners, who were public officers, appointed by the Governor and Senate, and over whom the city had no control; but on the ground that they acted at the instance and for the benefit of the corporation, the city was held liable. In Spencer *v.* Campbell, 9 *W. & Ser.* 32, this court held the owners of a steam grist-mill liable for a customer's horse killed by the bursting of a boiler.

Authorities and analogies might be multiplied, but these are sufficient to show that when we apply the principle *sic utere tuo*, &c., to this defendant in the circumstances of his case, we inaugurate no novelty.

He knew, for he had been expressly told, that if he leased his storehouse to the government, it would be used for heavy storage. He leased it to the government without any stipulations against heavy storage. The learned judge was in no error, then, in saying, not by way of construing the lease, but as a matter of fact, that if the evidence was believed, the building was leased for heavy storage, and the conclusion of law was a necessary one, that it might legally be used as such. But before it was heavily stored, it fell down through inherent defects. Had it fallen before it was used at all—had the superstructure been so defective as to be unable to sustain itself—it would have been indictable as a common nuisance, and nobody doubts that the owner at whose instance it was erected would have been answerable to individuals for the damage occasioned; but the wrong consisted not in erecting walls incapable of standing alone, but in building and renting the store for a specific purpose for which it was unfit and unsafe. In itself it may not have been a common nuisance, but the maxim *sic utere* is not limited to common nuisances. The cases cited, and many more that might be cited, show that it has a much more extensive application, for in all civil acts the law does not so much regard the intent of the actor as the loss and damage of the party suffering. In trespass *quare clausum fregit*, the defendant pleaded that he had land adjoining the plaintiff's close, and upon it a hedge of

[Carson *v.* Godley.]

thorns; that he cut the thorns, and that they, *ipso invito*, fell upon the plaintiff's land and the defendant took them off as soon as he could. On demurrer, judgment was given for the plaintiff, on the ground that though a man do a lawful thing, yet, if any damage thereby befalls another, he shall be answerable if he could have avoided it—*Broom's Legal Maxims* 161. Be it then that the store was a lawful structure, the defendant so used it as to hurt the plaintiff in his property, and this was to violate a fundamental maxim of the law. With his eyes wide open to the fact that government would use his storehouse for heavy storage, he let them have it, knowing that it was unfit for such use, and he inserted no word of caution or restraint in the lease. As was said in Hagerty's case, "if after the building was finished, he knew there were defects in it which unfitted it for the designated purpose, he should have stipulated in the lease against its being used for heavy storage. He omitted his duty in both respects—he did not build a strong storehouse, and he did not forbid heavy storage." Tempted by a large rent, he permitted his building to be subjected to burthens too heavy for it to bear, though lighter than the tenant had the right to impose, and herein is the ground of his liability. We go not one inch beyond the case before us. We say not that he would be liable if he had sold the building, and parted with all control over it; or if he had employed master builders, and the best of materials, or if he had stipulated for a use proportioned to its strength, but we pronounce him liable in the precise circumstances of the case. It is not our office to decide possible and hypothetical, but actual, cases—such as are made to hand. And taking this case just as it is presented in the record, we conceive there is a clear, legal liability, which considerations of public policy and private right demand should be enforced against the defendant.

The answers of the court to the several points submitted on the part of the defendant, were quite as favourable as, in view of the general principles we have discussed, he had any right to expect.

If the evidence of the fall of other stores built by the defendant in the same row had been offered to establish his reputation, or that of his mechanics as builders, it would have been incompetent on the principle of Waugh *v.* Shunk, 8 *Harris* 130; but offered, as it was, to bring home notice to him of the insufficiency and unsafety of the kind of building he was about to erect, it was competent proof. It took away all pretence of mistake, and showed a reckless perseverance in wrong doing, which, if the law cannot prevent, it will punish.

There is nothing in the other bills of exception to evidence that merits discussion.

The judgment is affirmed.

BLACK, J., dissented.